### ORDER

## In re J.V.N.

C.P. of Berks County, no. 75560.

*Stanley J. Kuter,* for petitioners.
*David R. Pollak,* for respondent.
*John J. Grenko,* guardian ad litem for J.V.N. III

P.M. SCHMEHL, *J.,* October 29, 1998—This matter is before the court on a petition for involuntary termination filed by J.V.N Jr., Father, and his wife, D.L.N., on August 3, 1998. The petitioners seek to terminate the parental rights of M.F., Mother.

The basis for the petitioners' request for involuntary termination is 23 Pa.C.S. §2511(a)(1): Mother "by conduct continuing for a period of at least six months either evidenced a settled purpose of relinquishing parental claim to [J.V.N. III] or has refused or failed to perform parental duties." In support thereof, the petitioners aver that Mother has had no contact with J.V.N. III since before October 19, 1992 when a court order, prohibiting Mother from contact with Father's family, was entered in the custody action. They also aver that Mother has never provided monetary support for J.V.N. III and that, based on her previous actions in dealing with them, she has an inability to have a stable relationship with J.V.N. III and Father.

Since their marriage two years ago, Father and D.L.N. have lived in Hamburg with J.V.N. III. They have a harmonious familial relationship in which, by all accounts, J.V.N. III is doing well. For the two years which Father and his family have been living in Hamburg, Mother has not known of their whereabouts. Mother did know of Father's prior Birdsboro address and has had a continuing knowledge of Father's parents' residence and phone number.

Father and J.V.N. III have not talked about Mother in the last two years; however, once in a while J.V.N. III talks with D.L.N. about Mother. D.L.N. testified that J.V.N. III feels threatened by Mother and does not want to go back to his past life because he was left crying and Mother did not care about him.

Mother has had no contact with J.V.N. III in the last two years. In the beginning of the custody action Mother had sent cards, but in the last two years she has sent no cards or gifts nor has she made any phone calls to Father, his parents, or J.V.N. III. Mother has not known where Father has been living or working

but Father testified that she could have found out where he lived by calling his parents. The court notes, however, that the October 19, 1992 order prohibits such contact. Father testified that the last personal contact he had with Mother was approximately 1992 when she came to his residence in Birdsboro.

Mother's actions to attempt to maintain or establish a relationship with J.V.N. III consisted of phone calls to Father in an attempt to speak to their son. She also filed a petition for modification of the custody order and left gifts for J.V.N. III on the premises of Father's Birdsboro residence.[1]

Father felt the phone calls were of a harassing nature, at least one of which came at 3 a.m. while he was sleeping. Father testified that Mother called at all hours to talk with their son, or she called and simply hung up. As a result, he changed his phone number. Mother testified that she made the phone calls and harassed Father because that is what she was instructed to do by Central Penn Legal Services, although she did not understand why.

In March 1995, Mother filed a petition for modification of the custody order. This action was terminated for lack of activity, but Father believed it was because Mother did not appear for a hearing. Mother testified that she did appear and that when Father came he brought the gifts which she had left on his property for J.V.N. III. Father testified that he returned the gifts because they were used and beaten toys. Mother testified that the toys were brand new. The gifts, when left on Father's property, bore Mother's name but were labeled in no

---

1. Mother testified that she also sent J.V.N. III $15 cash "every now and then" when she was working and could afford it. Father testified that he never received any money from her.

other way. Mother never again left gifts because she believed J.V.N. III would not get them if she left any. In the six months before Father moved to Hamburg, he received no calls, gifts or visits from Mother.

Mother does not want her son to be adopted by Father's wife. Mother testified that she has not stopped thinking of her son, that she still wants custody and/or visitation with him, and that he would do fine in her home and with her family. At least in part, she justifies her lack of contact with J.V.N. III by a court order which prohibits her contacting him.[2]

Mother also suffers from paranoid schizophrenia. In the past, she has been hospitalized several times for her mental illness and currently takes Zyprexa, a prescription drug. She is supposed to take her medication every day but does not always do so because her 3 1/2-year-old daughter does not like it when she takes the pills and told her not to take this medication. Although her doctor told her to take her medication every day no matter what, she testified that she does not always take her pills so as to test if and how her conduct differs with or without the medication.

The parties stipulated to the facts presented in the report of John Grenko, Esquire, who, at the court's request, agreed to serve as guardian ad litem for the child. Mr. Grenko's conclusions and recommendations, to which the parties did not stipulate, will be discussed below as his conclusions, and reasoning therefor, coincide with those of the court.

---

2. The March 31, 1992 order of court entered by agreement of the parties, granted legal and physical custody to Father and further provided that Mother "shall have no personal contact with the . . . child." Mother was permitted to send cards, gifts and other appropriate items to J.V.N. III.

In a proceeding for involuntary termination of parental rights, the burden of proof is upon the party seeking the termination to establish by clear and convincing evidence the existence of grounds for so doing. *E.g., In re E.S.M.,* 424 Pa. Super. 296, 302, 622 A.2d 388, 392 (1993). In determining whether to involuntarily terminate parental rights, the court must examine the individual circumstances of the case, as well as any explanation offered by the parent, to determine if the evidence, in light of the totality of the circumstances, clearly warrants involuntary termination of that parent's rights. *Id.* at 303, 622 A.2d at 392. The parent must exhibit reasonable firmness in attempting to overcome any barriers or obstructive behavior of others, and he or she must affirmatively demonstrate love, protection and concern for the child. *Id.* In attempting to preserve parental rights, "[a] parent must pursue a 'course of conduct during the period in question which is consistently aimed at maintaining [the parental] relationship . . . using those sources reasonably available . . . and exercising persistence in attempting to overcome obstacles placed in the path of the parent/child relationship . . . .' " *In re D. J. Y.,* 487 Pa. 125, 131, 408 A.2d 1387, 1390 (1979). If the court determines that the requirements for involuntary termination of parental rights have been met, the court must further inquire whether termination will clearly serve the "needs and welfare" of the child. *In re E.S.M.,* 424 Pa. Super. at 304, 622 A.2d at 392; 23 Pa.C.S. §2511(b).

Clearly the best interests of the child warrant termination of Mother's rights. J.V.N. III has not had a relationship with his mother, much less a healthy one; whereas, he has a healthy relationship with D.L.N. D.L.N. considers J.V.N. III to be her son and he apparently considers her to be his mother. Father, D.L.N.

184

and J.V.N. III all exist as a family except in name only, which apparently creates in J.V.N. III the fear that he could be torn from his family. The court agrees with Mr. Grenko's conclusion that it would be better to terminate Mother's parental rights in order for her son to have a relationship with two parents in the same household. The family, and J.V.N. III in particular, needs to move on and cannot be expected to live in the shadow of a mother that has been virtually unknown to her son. Terminating the rights of Mother and allowing an adoption by D.L.N. would give J.V.N. III, Father and D.L.N. a sense of permanence in their familial relationship which will greatly benefit the child in all respects, but especially emotionally.

Mother has not been there for J.V.N. III. Mother has had no contact with her son for several years. There has been no in-person visits, no phone calls, no letters, no cards, no gifts. Mr. Grenko was not comfortable recommending termination of Mother's rights, given the difficult situation of court orders prohibiting her contact with J.V.N. III. The court notes, however, that the March 1992 order prohibiting her from having contact with her son and granting Father legal and physical custody was entered by her agreement; it was not court imposed. The last paragraph of that order even provides that if either party wished to change the terms of the order, that party should file a petition requesting modification. Mother filed such a petition in March 1995 but failed to follow through on the action. In particular, she did not complete the court-ordered evaluations with Lynne Mullis MSW. Furthermore, it was her harassing Father and his family which led to a court order whereby she was to have no contact with them.

For the most part, the obstacles in Mother's path to having a relationship with J.V.N. III were self-caused,

but she still had the capability of sending letters, cards and gifts to J.V.N. III. She could have sought legal services in order to maintain or re-establish contact with her son. She could have sought help from the counselors treating her for her mental illness. She did not complete the court-ordered evaluations in her modification of custody action. She did not participate in an evaluation to be conducted by Dr. Rotenberg in 1992, following her alleged suicide attempt. She has not been able to allow others to help her in overcoming her mental illness such that she could take better care of herself and be able to spend time with her son in some meaningful capacity. She even openly admitted that she is influenced in her treatment by her 3 1/2-year-old daughter. The type of thinking displayed by Mother in allowing her daughter to influence her basic treatment concerns Mr. Grenko (as well as the court) about her ability to parent. Mental illness or not, Mother has not done enough to care for herself or for her son so as to preserve her parental rights over him. This lack of care was evident even in the courtroom. She had a flat affect. Nothing rattled her—she just sat there without any real display of emotion. Whether due to her illness or the combination of her illness and the medication, she was there in body only.

Mother has failed to perform parental duties for J.V.N. III. She has not adequately explained her failure and it would clearly be in the best interests of J.V.N. III for Mother's parental rights to be terminated. For the foregoing reasons, the court enters the following decree nisi:

## DECREE NISI

And now, October 29, 1998 the petition for involuntary termination of parental rights of M.F. as to minor child, J.V.N. III, is hereby granted.

M.F. shall have 10 days from the date of this decree nisi to file exceptions. Failing the timely filing of exceptions, this decree nisi shall become a final order of court.